### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

**IN THE MATTER OF THE SEARCH OF:**

**IPHONE 6S WITH S/N FK1QDMEMGRY9**

**Mag. No.**

### AFFIDAVIT IN SUPPORT OF AN APPLICATION
### UNDER RULE 41 FOR A WARRANT TO SEARCH

I, Floriano Whitwell, Senior Inspector with the United States Marshal Service (USMS) (hereinafter the "affiant") being duly sworn, depose and state the following:

### INTRODUCTION AND AGENT BACKGROUND

1.  I make this affidavit in support of an application for a search warrant for the authorization of the examination and extraction of electronically stored information contained in cellular telephones.  The electronic devices (hereinafter **Target Device**) to be searched are described further in the following paragraphs and Attachment A.

2.  I am a Senior Inspector with the United States Marshals Service and, as such, I am charged with enforcing all laws in all jurisdictions of the United States, its territories and possessions.  My tenure with the United States Marshals Service spans over fourteen years.  I am an "investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States, who is empowered by law to conduct investigations of or to make arrests for offenses listed in 18 U.S.C. § 2516.  I have been conducting criminal investigations for the past twelve years, and I have been a Sex Offender Investigator for seven years.  I am responsible for investigating crimes involving individuals who are convicted sex offenders and who have failed to register as required by the Sex Offender Registration and Notification Act ("SORNA"), also known as the Adam Walsh Act.

1

## BASIS FOR FACTS CONTAINED IN THE AFFIDAVIT

3.   Throughout this investigation, law enforcement officers and agents have worked together to collect and record information about the illegal activities of those under investigation.  The facts and information contained in this affidavit are based upon my personal knowledge, and information obtained from state and federal law enforcement officers, as well as from your affiant's own review of the materials involved in the multiple investigations.

4.   This affidavit contains information necessary to support probable cause for this application.  It is not intended to include each and every fact and matter observed by me, other law enforcement officers, or known to the government.  Not every fact known to this investigation or by the government is set forth in this affidavit.  Additionally, unless otherwise noted, wherever in this affidavit I assert that a statement was made by an individual, that statement is described in substance, and in part, and is not intended to be a verbatim recitation of the entire statement.

## IDENTIFICATION OF THE TARGET DEVICES TO BE EXAMINED

5.   This affidavit is respectfully submitted in support of a search warrant for an Iphone 6s with S/N FK1QDMEMGRY9, belonging to Charles Morgan ("MORGAN") which was retrieved from his residence at the time of his arrest on July 6, 2016.

## RELEVANT STATUTES

6.    This investigation concerns alleged violations of 18, United States Code, Sections 2423(a),  2250(a) and (c), 2251, and 2252.  Section 2423(a) involves the defendant's knowing transportation of a 15-year-old minor across state lines for the purposes of sexually assaulting her.  Section 2250(a) and (c) relates to the defendant's failure to register as a sex offender while committing a crime of violence (to wit: kidnapping, in violation of 18 United States Code, Section 1201).  Sections 2251 and 2252 involve material involving the sexual exploitation of

minors, specifically, the use of a minor to produce a depiction of that minor engaged in sexually explicit conduct (Section 2251) and the possession of material that involves a depiction of a minor engaged in sexually explicit conduct (Section 2252).

## RELEVANT DEFINITIONS

7.   The following definitions apply to this Affidavit:

a.      The Internet is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

b.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any adversary that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

c.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website.

3

d.      "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

e.      "Child Pornography" means the definition in 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct), as well as any visual depiction, the production of which involves the use of a minor engaged in sexually explicit conduct. *See* 18 U.S.C. §§ 2252 and 2256(2)(8).

f.      "Computer" means "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." *See* 18 U.S.C. § 1030(e)(1).

g.      "Minor" means any person under the age of eighteen years. *See* 18 U.S.C. § 2256(1).

h.      "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons. See 18 U.S.C. § 2256(2).

i.      "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image.  *See* 18 U.S.C. § 2256(5).

## FACTS ESTABLISHING PROBABLE CAUSE

8.   The **Target Device** is currently in the lawful possession of the FBI.  The item came into the FBI's possession following the arrest of the defendant pursuant to an arrest warrant at his home in Maryland.  A search was executed pursuant to a valid search warrant, and the **Target Device** was seized as a result of that search.  The **Target Device** is currently in storage in the Evidence Control Room at the FBI office in Washington, D.C., a location within the District of Columbia.  In my training and experience, I know that the **Target Device** has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as it was when the **Target Device** first came into the possession of the USMS and the FBI.  For the reasons set forth below, I respectfully submit there is probable cause to believe that evidence of the pornographic images of minors and/or naked images of individuals taken without their consent, as well as images concerning the defendant's residency, will be located on the **Target Device**.

### A.  General Background

9.   MORGAN was born in October [X], 1960.  On January 14, 1989, MORGAN was arrested and charged with Rape While Armed in D.C. Superior Court Criminal Case F-29-89.  On February 10, 1989, MORGAN was arrested and charged in a second case with Rape While Armed and other related offenses in D.C. Superior Court Criminal Case F-1688-89.  On March 18, 1991, MORGAN was convicted of Rape while Armed, along with other related offenses, in D.C. Superior Court Criminal Case F-1688-89.  MORGAN was sentenced to 12 to 36 years of

incarceration.  During the course of the presentence investigation, MORGAN also admitted to coercing another victim, presumably the victim in Criminal Case F-29-89, into having sex with him against her will.  On August 26, 2009, MORGAN was released from incarceration into a halfway house until November 12, 2009.  As a result of the above conviction, MORGAN is currently being supervised by Court Services and Offender Supervision Agency (CSOSA) until July 18, 2031.

10. Due to the defendant's sexual assault conviction, MORGAN was required to register as a sex offender upon his release from incarceration.  Accordingly, on September 3, 2009, MORGAN initially registered as a sex offender with the District of Columbia Sex Offender Registry.  MORGAN was classified as a Class A sex offender who is required to register as a sex offender every three months for the rest of his life in the District of Columbia.  MORGAN signed a registration sheet that acknowledged his registration requirements, including his acknowledgement of his obligation to report any changes of home, work, or school addresses within three days to the District of Columbia Sex Offender Registry.

11. Thereafter, on November 12, 2009, February 4, 2010, April 29, 2010, August 12, 2010, and November 9, 2010, MORGAN registered as a sex offender with the District of Columbia Sex Offender Registry and provided a home address of [Address A,] Southeast, Washington, D.C. with phone number 202-367-XXXX.  On January 5, 2011, February 3, 2011, April 25, 2011, July 21, 2011, October 14, 2011, March 6, 2012, June 20, 2012, September 26, 2012, December 19, 2012, March 15, 2013, and June 7, 2013, MORGAN registered as a sex offender with the District of Columbia Sex Offender Registry and provided a home address of [Address B,] Southeast, Washington, D.C. and phone number 202-367-XXXX.

12. Additionally, on March 26, 2013, MORGAN registered a 2013 black Toyota RAV4

6

vehicle with the District of Columbia Department of Motor Vehicles.  The vehicle was assigned

License Plate EG-6994 and is insured by GEICO.

13. On August 26, 2013, MORGAN moved to Weston, Florida, and registered as a sex

offender with the Broward County Sheriff's Office.  MORGAN was classified as a lifetime

registrant in the State of Florida.  However, on September 5, 2013, MORGAN returned to the

District of Columbia and registered with the District of Columbia Sex Offender Registry a home

address of [Address B,] Southeast, Washington, D.C. and phone number 202-367-XXXX.

MORGAN provided this same information to the District of Columbia Sex Offender Registry

Unit on November 29, 2013, February 20, 2014, May 16, 2014, November 20, 2014, and

February 23, 2015.

14. On August 4, 2015, MORGAN registered with the District of Columbia Sex

Offender Registry and provided a new home address of [Address C,] Northwest, Apartment

#D19, Washington, D.C. and phone number 202-367-XXXX.  MORGAN was required to

provide a notarized letter from the leaseholder or homeowner within seven days to confirm

residency but MORGAN failed to do so.

15. On November 10, 2015, MORGAN registered as a sex offender with the District of

Columbia Sex Offender Registry and provided a new home address of [Address D], Northeast,

Washington, D.C. and phone number 202-367-XXX.  MORGAN provided a notarized 'Rental

Agreement Letter' signed by "Major L. Coleman" of [Address D], Northeast, Washington, D.C.,

who confirmed that MORGAN rented a room at the above address for $600 a month.  The

notarized letter was signed and dated August 17, 2015 from "Major L. Coleman."

16. On March 29, 2016, MORGAN again registered with the District of Columbia Sex

Offender Registry and provided the home address of [Address D], Northeast, Washington, D.C.

with phone number 202-367-XXXX.

B. **Sexual Assault Investigation**

17. On May 23, 2016, C-1, who was 15 years old, was visiting her grandmother in Washington, D.C.  After getting into an argument with her grandmother, C-1 left the residence at approximately 9:00 pm.  At approximately 12:30 am, C-1 attempted to get into her mother's residence, but the door was locked so C-1 then decided to spend the night at a friend's home on Naylor Road, Southeast.  C-1 walked along Minnesota Avenue, Southeast, Washington, D.C. as she waited for the metro bus to arrive.

18. As C-1 walked down the street, a stranger, subsequently identified as MORGAN, approached C-1 in a "black SUV 4-door vehicle."  Initially, C-1 informed investigators that MORGAN grabbed her by the arm and forced her into the car.  However, during a subsequent interview, C-1 admitted that she voluntarily got into MORGAN's car after MORGAN asked her if she needed a ride and provided C-1 with his business card.  This business card had the name "C. Morgan," and indicated that he was an "Independent Right Knowledge Distributor" who worked for "Anubian Inc. Your Connection To The Sun."  The business card provided the location of "DC-MD-VA" and two means of contact for "C. Morgan:" telephone number 202-367-XXXX and charles.morganXXXX@yahoo.com.  MORGAN also subsequently identified himself to C-1 as "Chuck."

19. Once in the vehicle, MORGAN asked C-1 for her name and age.  C-1 informed him of her name but told him she was 14 years old so that she appeared younger (in an attempt to feel safer accepting a ride from MORGAN, a stranger.)  C-1 told MORGAN that she was headed towards Pennsylvania Avenue, but when she realized MORGAN was driving the opposite way, C-1 got a bad feeling about being in the car with MORGAN.  C-1, afraid for her safety, froze in the passenger seat and remained silent.

20. C-1 recognized that MORGAN drove by Fort Davis Recreation Center in

Washington, D.C., and then approximately five minutes later, MORGAN stopped his vehicle on the side of the road. MORGAN told C-1 to "relax" and reclined her chair back. C-1 refused to sit back, so MORGAN pushed her back into the chair, pulled up her shirt, and rubbed and licked C-1's breasts. C-1 told him to stop, but MORGAN asked C-1 if she wanted to get hurt and to do everything he said. MORGAN was rubbing between C-1's legs, and C-1 informed him that she was currently menstruating. MORGAN became angry and forcefully inserted his fingers inside of C-1's anus. MORGAN also grabbed C-1 by her head and forced C-1 to perform oral sex on him but did not ejaculate. Thereafter, MORGAN told C-1 that he was going to take her to his house and that he was happy that C-1 was going to be his new friend. MORGAN told C-1 that he liked her because she was young.

21. A few minutes later, MORGAN and C-1 arrived at a house in Maryland. C-1 believed that they were in Maryland based on the fact that the houses looked different than they do in Washington, D.C., the street signs did not have the D.C. quadrants on them, and she saw passed by the "Welcome to D.C." sign through the driver's side window. Additionally, C-1 observed a bank and a convenience store near the home.

22. MORGAN forced C-1 to follow him into the house and towards a bedroom. C-1 described entering the basement apartment and observing a kitchen, a living room, and two bedrooms. C-1 observed several mattresses leaning against the walls in the living room and in the hallway. C-1 heard a television on in one of the bedrooms but did not observe anyone else in the unit.

23. Once in a bedroom, MORGAN undressed C-1 and licked C-1's breasts again. MORGAN forced C-1 to perform oral sex on him again but did not ejaculate. MORGAN then pushed C-1 onto his bed, forced C-1 to bend over, and MORGAN forced his penis inside of C-1's anus. C-1 began to cry, but MORGAN continued penetrating C-1's anus and called C-1 his

"hoe" and "bitch."  MORGAN then pulled out and ejaculated into his hand.  MORGAN ordered

C-1 to wash up, get dressed, and escorted C-1 back to his vehicle.  MORGAN then drove C-1

back into Washington, D.C. and C-1 observed the "Welcome to D.C." sign on their drive back.

MORGAN dropped C-1 at a bus stop in Washington, D.C.  MORGAN gave C-1 a handwritten

piece of paper with his telephone number, 202-367-XXXX, and the name "Mr. C" on it.

MORGAN told C-1 to text him when she got home and not to tell anyone about what he had

done to her.  MORGAN also told C-1 that the following Saturday, MORGAN and his friend

"John" were going to "fuck" C-1 and that C-1 did not have a choice.

24. After MORGAN let C-1 out of the vehicle, C-1 went directly home.  At

approximately 2:00 am, C-1 entered her home.  C-1 was crying and reported to her mother that

she had just been raped.  Detective Mancuso with the Metropolitan Police Department, Youth

Division, was assigned to investigate the sexual assault case.  C-1 was able to provide a limited

description of her assailant as a black older male, who was at least in his 40s.  C-1 was

subsequently transported to Prince George's County Hospital for a sexual assault examination.

C-1 reported the intensity of pain in her anus to be 8 out of 10.  The sexual assault nurse

examiner documented multiple tears and abrasions in her anus between 10 and 12 o'clock, at 5

o'clock, and at the 7 o'clock positions.

25. On May 27, 2016, Detective Mancuso with the Metropolitan Police Department,

using C-1's cellular phone, texted with MORGAN using telephone number 202-367-XXXX, and

Detective Mancuso pretended to be C-1.  In pertinent part, the following is a portion of this text

exchange:

| | |
|---|---|
| **DETECTIVE AS C-1**: | My mom was mad I got in late Sunday night so she take my phone and I just got it back today after school {This is [C-1]} |
| **202-367-XXXX**: | When can I pick you up this evening.  Where? |
| **DETECTIVE AS C-1**: | Moms all over me Don't know |
| **202-367-XXXX**: | Ok.  Let me know. |

| | |
|---|---|
| **DETECTIVE AS C-1**: | I'll try to get out later. |
| **202-367-XXXX:** | JUST DO IT |
| **DETECTIVE AS C-1**: | Was goin to say meet up next week |
| **202-367-XXXX:** | Go take pic of that pussy and asshole and send to me |
| **DETECTIVE AS C-1**: | One minute |

26. At that time, Detective Mancuso had C-1 conduct a one-party consent call to MORGAN's telephone number in the presence of Detective Mancuso. During this call, MORGAN called C-1 by her name and repeatedly asked C-1 if she could get out of her house. When C-1 told him she was unable to leave for the night, MORGAN berated C-1 and told her she "doesn't want it bad enough then" before hanging up on her. C-1 then called MORGAN back. MORGAN ordered C-1 to take her pants down and take a picture and send it to him. MORGAN asked if he was going to see C-1 that weekend and whether C-1 "wants" him. When C-1 began to inquire about the prior sexual acts, MORGAN became suspicious and asked C-1 what she was talking about. Thereafter, MORGAN hung up on C-1.

C. **SORNA Investigation**

27. On May 24, 2016, upon learning of the sexual assaults involving MORGAN, who was registering as a sex offender in Washington, D.C., but potentially residing in Maryland, your affiant opened an investigation into MORGAN's failure to register as a sex offender while committing a crime of violence. Your affiant conducted an insurance claim query for MORGAN. The records reflected that MORGAN filed an insurance claim with Geico on March 15, 2016 regarding a vehicle accident in the District of Columbia. As part of the claim processing, MORGAN provided a home address of [Address E], Capitol Heights, Maryland and telephone number 202-367-XXXX. Another record reflected that MORGAN filed a vehicle insurance claim on November 29, 2015. As part of that claim processing, MORGAN again

provided a home address of [Address E], Capitol Heights, Maryland and telephone number 202-367-XXXX.

28. On June 1, 2016, your affiant analyzed the cell site tower locations for the first and last cell tower associated with every phone call made and received on cellular phone 202-367-XXXX from February 25, 2016 through May 26, 2016.  The call detail records included 3,855 recorded cell site tower locations.  Your affiant determined that the most frequently accessed cell site tower, accounting for 25.1% of all cell tower activity within the call detail records, is located at 4714 Marlboro Pike, Capitol Heights, Maryland and is .4 miles from [Address E], Capitol Heights, Maryland.  This cell tower is the primary cell tower that provides cell phone coverage to [Address E], Capitol Heights, Maryland.

29. On June 2, 2016, the USMS initiated surveillance at [Address E], Capitol Heights, Maryland utilizing a pole camera.  On June 2, 2016 at 5:43pm, your affiant was monitoring the video feed of the above pole camera and observed MORGAN park a black Toyota RAV4 vehicle bearing license place EG-6994 in front of the home.  MORGAN exited the vehicle, checked the mail, and approached the right side of the residence.  Additionally, another investigator with the United States Marshals Service has reviewed the video surveillance from June 3, 2016 until June 18, 2016 and has frequently observed MORGAN coming and going from [Address E], Capitol Heights, Maryland on a daily basis.  MORGAN appears to spend the night there and leave in the morning between 8:00am and 9:00am Monday through Friday.  MORGAN's activity varies on the weekends.

### D.  Arrest and Additional Investigation

30. On July 6, 2016, the defendant was arrested pursuant to an executed arrest warrant at

his home in Maryland.  At the time that the arrest warrant was executed, members of the team also executed a search warrant and recovered from MORGAN's bedroom the **Target Device,** which was recovered on top of MORGAN's desk in his bedroom.

31. This cellular phones is the phone that MORGAN used to text and communicate with C-1, as indicated above.  Using this phone, MORGAN had asked the minor victim to send child pornographic images to him through text messages.  It is thus, likely, that MORGAN has asked other minors to send child pornographic images to him through text messages that would be saved in his images content within the cellular phone.

32. Furthermore, during the course of your affiant's investigation, your affiant learned that MORGAN's "thing" is to cruise for females on the street and pick them up for "sexual exploits."  A witness informed your affiant that MORGAN often takes naked pictures of these women (and thus, potentially minors) whom he has had sexual intercourse with, using his cellular phone.  The witness knows this because MORGAN would often show these naked images to the witness.  MORGAN last showed this witness an image of a naked female, who appeared asleep and thus, unaware that MORGAN was taking the photograph, approximately 4-6 weeks earlier.  The witness also advised that MORGAN set up a "special code" to access these "special" pictures on his cellular phone.

33. On July 21, 2016, MORGAN had a status hearing in his criminal cases, 16-MJ-515 and 16-MJ-516.  In open court, MORGAN provided his consent before the Honorable Judge Lamberth for investigators to search the contents of his cellular phone, to include all "electronic content" and deleted material.  MORGAN provided his password to the Assistant U.S. Attorney, Lindsay Suttenberg, in order for investigators to access the cellular phone.

34. On July 22, 2016, investigators reviewed the contents of MORGAN's cellular phone

and identified a special application called SpyCalc that looks, on its face, like a calculator, and appears to be an application that stores MORGAN's images and videos.  One must enter a six digit passcode in order to access the contents of this application.  When investigators reviewed the amount of storage used by SpyCalc on the cellular phone, it took up approximately 4 gigabytes of data.  The application, itself, only took up approximately 31 megabytes of data, so your affiant is aware that most of the contents within the SpyCalc application contained on the cellular phone are images and videos that MORGAN uploaded into this application for his "special pictures."

35.  Your affiant is aware that investigators with the Federal Bureau of Investigation can use specialized tools and methods to decrypt the password on MORGAN's cellular phone in order to view the content within the SpyCalc folder.  Although MORGAN provided his verbal consent for investigators to access the "electronic content" contained on the cellular phone, your affiant is requesting this search warrant specifically for the contents within SpyCalc, that are password protected, out of upmost caution so as to protect both MORGAN's Fourth Amendment rights and the admissibility of any evidence located within the contents of the SpyCalc application.

## **FORENSIC ANALYSIS**

36. ***Methods To Be Used To Search Digital Devices***.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals, specialized

14

equipment, and software programs necessary to conduct a thorough search.  Digital

devices – whether, for example, desktop computers, mobile devices, or portable storage

devices – may be customized with a vast array of software applications, each generating a

particular form of information or records and each often requiring unique forensic tools,

techniques, and expertise.  As a result, it may be necessary to consult with specially

trained personnel who have specific expertise in the types of digital devices, operating

systems, or software applications that are being searched, and to obtain specialized

hardware and software solutions to meet the needs of a particular forensic analysis,

especially where here, it is necessary to override the **Target Device's** password for the

application.

b.      Digital data is particularly vulnerable to inadvertent or intentional

modification or destruction.  Searching digital devices can require the use of precise,

scientific procedures that are designed to maintain the integrity of digital data and to

recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery

of "residue" of electronic files from electronic storage media also requires specialized

tools and often substantial time.  As a result, a controlled environment, such as a law

enforcement laboratory or similar facility, is essential to conducting a complete and

accurate analysis of data stored on digital devices.

c.      Digital device users can attempt to conceal data within digital devices

through a number of methods, including the use of innocuous or misleading filenames

and extensions.  For example, files with the extension ".jpg" often are image files;

however, a user can easily change the extension to ".txt" to conceal the image and make

it appear that the file contains text.  Digital device users can also attempt to conceal data

by using encryption, which means that a password or device, such as a "dongle" or

"keycard," is necessary to decrypt the data into readable form.  Digital device users may

encode communications or files, including substituting innocuous terms for incriminating

terms or deliberately misspelling words, thereby thwarting "keyword" search techniques

and necessitating continuous modification of keyword terms.  Moreover, certain file

formats, like portable document format ("PDF"), do not lend themselves to keyword

searches.  Some applications for computers, smart phones, and other digital devices, do

not store data as searchable text; rather, the data is saved in a proprietary non-text format.

Digital device users can conceal data within another seemingly unrelated and innocuous

file in a process called "steganography."  For example, by using steganography a digital

device user can conceal text in an image file that cannot be viewed when the image file is

opened.  Digital devices may also contain "booby traps" that destroy or alter data if

certain procedures are not scrupulously followed.  A substantial amount of time is

necessary to extract and sort through data that is concealed, encrypted, or subject to

booby traps, to determine whether it is evidence, contraband or instrumentalities of a

crime.

      d.      Based on all of the foregoing, I respectfully submit that searching the

**Target Device** pursuant to this warrant may require a wide array of electronic data

analysis techniques to override the **Target Device's** password, and may take weeks or

months to complete.  Any pre-defined search protocol would only inevitably result in

over- or under-inclusive searches, and misdirected time and effort, as forensic examiners

encounter technological and user-created challenges, content, and software applications

that cannot be anticipated in advance of the forensic examination of the media or devices.

In light of these difficulties, your affiant requests permission to use whatever data

analysis techniques reasonably appear to be necessary to locate and retrieve digital

information, records, or evidence within the scope of this warrant, specifically, the contents contained within the SpyCalc application.

e.      In searching for information, records, or evidence contained within SpyCalc application, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

1.      The analysis of the contents of the **Target Device** may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

2.      In searching the seized **Target Device**, the forensic examiners may examine as much of the contents of the electronic storage media or digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.  Any search techniques or protocols used in

17

searching the contents of the seized electronic storage media or digital devices

will be specifically chosen to identify only the specific items to be seized under

this warrant.

## **CONCLUSION**

37. Based upon these facts, there is probable cause to believe that there are fruits and

evidence of offenses involving violations of 18, United States Code, Sections 2250(a) and (c)

(failing to register as a sex offender while committing a crime of violence), 2423(a)

(transportation of a minor across state lines for purposes of engaging in sexual criminal conduct),

and 2251 and 2252 (production and possession of child pornography), which will be found

within the seized **Target Device** – such as surreptitious pornographic images of C-1 that

MORGAN took during the course of the sexual act without C-1's permission, images confirming

MORGAN's residency, sexually explicit images of other minors whom MORGAN engaged in

sexual acts with and then photographed, and images of individuals in various stages of undress

and/or performing sexual acts without their knowledge that the image was being taken (i.e. the

nude photograph of the woman who appeared to be asleep), as further described in Attachments

A and Attachments B.

38. I declare under penalty of perjury that the statements above are true and correct to

the best of my knowledge and belief.

_____
Floriano Whitwell
Senior Inspector
United States Marshal Service

Sworn and subscribed before me
this 26th day of July 2016.

_____
United States Magistrate Judge

18